UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

  v.             CASE NO.:14-cr-00164-SDM-EAJ-1

DAVID BROCK LOVELACE

---

## MOTION FOR NEW TRIAL AND REQUEST FOR PROTECTION

---

COMES NOW, the Defendant, David Brock Lovelace, by and through his Undersigned Counsel and prays that this Honorable Court will grant this Motion for New Trial. As grounds therefore, the Defendant states as follows:

### I. INTRODUCTION

On April 24, 2014, a grand jury returned an Indictment naming the Defendant in 33 total counts. The Defendant was charged in Count one with conspiracy to commit health care fraud, counts 2 through 21 with health care fraud, count 32 with conspiracy to commit money laundering and on counts 33 through 43 with money laundering. On March 12, 2015, a Superseding Indictment was returned. In the Superseding Indictment, the Defendant was charged in 28 counts, alleging conspiracy to commit health care fraud and wire fraud in count 1, health care fraud in counts 2 through 19, conspiracy to commit money laundering in count 30, money laundering in counts 31 through 37, and aggravated identity theft in count 40. On December 11, 2015, after a ten day jury trial, the defendant was convicted on all counts. On March 8, 2016, the Defendant was sentenced to 174 months incarceration. The Defendant filed a notice of appeal on March 17, 2016, the appeal is still pending.

Since the beginning of this case, and despite his subsequent conviction, the Defendant continually has maintained that he did, in fact, provide services to the beneficiaries named in the

Superseding Indictment and that his claims to Medicare were supported by the medical records for each of the beneficiaries. Beginning in April, 2016, investigators located and interviewed most of the beneficiaries who were used to support the substantive counts against the Defendant, including those beneficiaries who were supposedly deceased. As set forth in detail below, this exhaustive investigation revealed substantial new evidence in this case which clearly warrants a new trial. In sum, the newly revealed evidence establishes the following:

1. The Defendant was indicted, tried, and subsequently convicted in eight (8) Counts of the Superseding Indictment for allegedly claiming to have provided medical services to individuals who were deceased. The post-trial investigation revealed undeniable evidence that the services were in fact performed on active Medicare beneficiaries eligible to receive services provided by eligible licensed and registered Medicare providers.

2. The Defendant was also indicted, tried, and subsequently convicted on ten (10) Counts of the Superseding Indictment for allegedly billing Medicare for services not rendered. The post-trial investigation provides compelling evidence that the concerned beneficiaries were in fact rendered medical services on the dates in question.

3. The entirety of the April 2014 Grand Jury testimony by HHS/OIG Special Agent Isaac Bledsoe procured by Senior DOJ Trial Attorney Christopher Hunter is false. No actual probable cause exists in the Grand Jury testimony. There are no material statements in the Grand Jury testimony to support probable cause other than false or misleading statements.

On October 24, 2016, The Diaz Group and Undersigned Counsel attended a meeting with

the US Attorney's Office in the Middle District of Florida. Senior DOJ Trial Attorney Chris Hunter, plus senior DOJ personnel from Washington DC were present and discussed the newly discovered evidence. While members on the government's side remain convinced it has acted properly, the Diaz Group stands by its Report and its newly discovered evidence that the defendant is innocent of the charges brought against him (Investigative Report page 11).

## II. MEMORANDUM OF LAW

Federal Rule of Criminal Procedure 33(b)(1) states that in order to prevail on a Motion for New Trial based on newly discovered evidence, the motion must be filed within three years of the verdict or finding of guilt. Newly discovered evidence is defined as "evidence that could not have been discovered with due diligence at the time of trial." *United States v. Vargas*, 243 Fed. Appx. 456, 457 (11th Cir. 2007) (quoting *United States v. Johnson*, 596 F.2d 147, 148 (5th Cir.1979)) "The District Court may grant a motion for new trial based on such evidence if the interest of justice so requires and if (1) the evidence was in fact discovered after trial, (2) the defendant exercised due care to discover the evidence, (3) the evidence was not merely cumulative or impeaching, (4) the evidence was material, and *(5)* the evidence was of such a nature that a new trial would probably produce a different result." *Id.* at 457-458. "Our court has also recognized a corollary to this requirement where 'the newly discovered evidence would afford reasonable grounds to questions … the integrity of the verdict.'" *United States v. Bowen*, 813 F.3d 600, 601 (5th Cir. 2016) (quoting *United States v. Williams*, 613 F.2d 573, 575 (5th Cir. 1980)) A motion for new trial was granted because the "interest of justice so requires," Fed. R. Crim. P. 33(a), and that motion was granted specifically based on newly discovered evidence. *United States v. Bowen*, 799 F.3d 336, 349 (5th Cir. 2015) "Newly discovered evidence need not relate only to guilt or innocence, but may be relevant to any controlling issue of law." *Id.*

### III. STATEMENT OF THE FACTS

**A. Background**

The Defendant was a businessman whose companies were engaged in the providing of medical services, specifically diagnostic testing subsequent to a lawful order by a licensed and registered physician in the State of Florida. The medical services were provided to the beneficiaries at specific physicians' offices and billed through separate corporations: Cornerstone Health Specialists, 5426 Strickland Avenue, Lakeland Florida and Summit Healthcare Specialists located at 15511 N. Florida Avenue, Suite 3, Tampa, Florida. The offices of these corporations were administrative only and were the locations from which the claims billing submissions were generated and were known to Medicare as the "Correspondence Address". No medical services were ever provided at either location. Additionally, although the claims are submitted to Medicare electronically through a CMS EDI 837 transmission (which is the raw data that is transmitted electronically) that transmission is transformed into accurate electronic depiction on the HCFA 1500, which is generated to memorialize that electronically submitted claim. In the original claims submissions generated by these corporations, the actual service location was clearly indicated in every claim. The original claims submissions are the claims as defined by 42 CFR 424.32. Claims are specifically defined as the transmission of request to receive payment. "The falsity of a claim is determined at the time of submission." *United States v Southland Mgmt Corp*, 288 F.3d 665, 681 (5th Cir. 2002). When analyzing what constitutes a claim, "the focus is on the conduct of the defendant." *United States ex rel. Cullins v. Astra, Inc.,* 2010 WL 625279 (S.D. FL. 2010). "It is conduct of the medical practitioner, not the disposition of the claims by the government, that creates

FCA liability." *United States v. Krizek*, 111 F.3d 934, 940 (U.S. App. DC 1997) "We do

not understand how the Special Master could have determined the number of false claims,

as directed, without researching the question of what constitutes a 'claim.'" *Id.* at 943.

        As providers for medical services to Medicare beneficiaries, the concerned corporations billed

based upon Medicare practices and procedures. Medicare recipients are identified through

an administrative identification number known as the "HCIN." The format of a HICN number

issued by CMS is a Social Security number followed by an alpha or alphanumeric Beneficiary

Identification Code (BIC). Some common influences of how a HCIN number can change over the

course of time are: "A" beneficiary (retired worker or disabled worker), "B" spouse (spouse is over

65), "C" children (child or grandchild of a retiree), "D" divorced spouse, widow, widower or "E"

widowed mother. In one of the examined cases, this was the situation which resulted in the

appearance of billing a deceased beneficiary, as more fully explained below.

        One of the locations where services were provided were the medical offices of Merfi

Corp located at 4800 SW 8th Street, Miami, FL and utilized by Dr. Henry Lora, among others. At this

clinic, in addition to the usual required demographic information, patients were required to

sign and date a form containing a copy of their driver license and Medicare card (which listed their

HICN number) and/or other photo identification on the days they visited the clinic. In some

instances, they often were required to provide fingerprints to further insure proper identification of

the patient receiving medical services.[1]

**MB**: Counts 2,3,4: These three counts of the Superseding Indictment charge that the defendant,

through Cornerstone Health, billed for three tests over the course of two days for a "dead"

---

[1] The government, of course, had the ability to compare the fingerprints to the actual patient beneficiaries. "[I]n a health care fraud case, the defendant must be shown to have known that the claims submitted were, in fact, false." *United States v. Medina*, 485 F.3d 1291, 1297 (11th Cir. 2007).

beneficiary. The service location noted on the HCFA [2] is 1151 Blackwood Ave, Ocoee, Florida. According to the death certificate, used to support these charges, the dead beneficiary is "█████████." The actual beneficiary who received the services is ██████████. Mrs. ███ was never contacted by the government. The prosecution team relied solely on the death certificate despite being alerted by the defendant about her vital status and despite the fact that the government had access to her medical records.

On June 1, 2016, The Diaz Group investigators located Mrs. ███ at her home at the address on her Medicare claim. Mrs. ███ confirmed she received the services at the Ocoee, Florida address on the dates in question and she specifically remembered that her primary care office had another ██████ and they could easily be confused. A simple records check would have revealed the existence of the ██████ who received the services.[3]

**AW**: counts 5,6: The defendant was convicted in these two counts of billing a "dead" beneficiary for tests on 3/27/12. The service location is clearly identified in Miami, Florida on the HCFA. The death certificate used by the prosecution team to support the charges was for ███████████████. The actual beneficiary who received the services is his son, ████████████████. The beneficiary was never contacted by the government. The Prosecution Team relied solely on the death certificate, despite being alerted by the defense that the actual beneficiary received services and despite the fact that the government had access to the patient's medical records. [4]

---

[2] As explained previously, the HCFA is a form that is generated to memorialize the original electronic claim submission which the provider transmits to Medicare.

[3] "To prove health care fraud, the defendant must be shown to have known that the claims submitted were, in fact, false. Claims are false if they were not medically necessary, or were not delivered to the patients." *United States v. Leon*, 569 Fed. Appx. 823, 825 (11th Cir. 2014)

[4] "Under § 1347(a), the government must show that the defendant knew that the submitted claims were false. Claims are false if they are, *inter alia,* for treatment that was not medically necessary, or for treatment that was not delivered to the patients." *United States v. Sosa*, 777 F.3d 1279, 1292 (11th Cir. 2015).

On May 25, 2016, The Diaz Group investigators located Mr. ███████s sister at the home address on the medical records and the Medicare claim.  Ms. ███████ identified that her brother is disabled and she takes care of him at her home.  Ms. ███████ also confirmed the death certificate is for her father and not her brother.  Ms. ███████ later coordinated a three way telephone call for investigators to confirm that he was the beneficiary and had received services.

**MP**: The defendant was convicted in Count 7 for billing Medicare for services not rendered to ███████ on 6/29/12 through Cornerstone health.  The Medicare claim clearly identifies the Miami, Florida address for Merfi Corp as the service location.  The Diaz Group confirmed the beneficiary received the services as billed. A comprehensive review of this investigation can be found in Exhibit A page 16-18.

**AA #1**: The Defendant was convicted in Count 8 for billing Medicare for services not rendered to ███████ on 8/17/12.  The service location on the Medicare claim is 4800 SW 8th St Miami, Florida, the clinic location utilized by Henry Lora, MD. On March 13, 2014 HHS/OIG agents interviewed Mr. ███████ and noted he stated he had never been to Lakeland or Melbourne and only visited Tampa once.  He had never heard of Cornerstone, Summit, or Coastal Health and did not recognize photographs of their offices.  He further stated he had never heard of David Brock Lovelace and did not recognize his picture.  Mr. ███████ did tell agents that Dr. Lora was his doctor until August or September 2013.  The agents did not ask if Mr. ███████ had tests performed at Dr. Lora's office, the service location on the Medicare claim.

On May 10, 2016 Mr. ███████ was interviewed at his home by The Diaz Group and identified a picture of Merfi Corp in Miami as the location he received ultrasounds and nerve

conduction studies.  Mr. ███████ specifically recalled the technologist by name who worked for

the Defendant, and who performed his nerve conduction study.  Mr. ███████ authenticated

documents dated 8/17/12 from his patient file indicating he had received the services.[5]

**BP**: This count charges that the Defendant, through Summit Health, billed Medicare for services

not provided to ███████.  The claim is for a nerve conduction study on 11/19/12 and the

service location on the Medicare claim is 4800 SW 8th St Miami, Florida. On March 13, 2014

HHS/OIG agents interviewed Ms. ███████ and she stated she had never heard of the Defendant's

companies and did not recognize offices in Tampa, Lakeland, or Melbourne.

On June 13, 2016 Ms. ███████ was interviewed at her home by The Diaz Group investigators.

Ms. ███████ recognized a photograph of the service location on the claim in Miami and recalled

that is where she had a nerve conduction test in 2012.  Ms. ███████ recalled the test from its

electrical shocks. She also authenticated her signature on medical documents dated 11/19/12.[6]

**RH**: The Defendant was convicted in count 11 of the Superseding Indictment for billing

Medicare for services not rendered to a "dead" beneficiary. The claim is for a nerve conduction

study performed on 11/28/12 and the "dead beneficiary" is identified as ███████. The

beneficiary who actually received services is ███████'s wife, ███████. The

Medicare claim specifically identified the patient as ███████ and the gender of the

patient was specifically identified on the claim as female.  However, the claims data generated

---

[5]"To convict Defendants of healthcare fraud under § 1347, the Government must prove not only that Defendants submitted claims for worthless services, but that Defendants knew that the services were worthless, and nevertheless submitted claims. The knowledge requirement adds an element of culpability and mitigates the vagueness concerns." *United States v. Houser*, 2011 WL 2118847 at *10 (N.D. GA. 2011).

[6] "A designated health service is "furnished" for purposes of paragraph (b) of this section in the location where the service is actually performed upon a patient or where an item is dispensed to a patient in a manner that is sufficient to meet the applicable Medicare payment and coverage rules. "42 CFR 411.355(b)(5)

by the government has removed the gender designation.  Ms. � was never contacted by the government. The Diaz Group interviewed Ms. �alllas, ▅▅▅▅▅'s daughter-in-law, at the home address listed on the claim.  Ms. ▆▆ explained that ▅▅▅▅▅ passed away after the date of service on the claim, but did verify that Ms. ▅▅▅▅ had a nerve conduction study while she lived with them.[7] (Ex. A pg 22-24)

**MM**: The Defendant was convicted in Count 12 for billing Medicare for services not provided to ▅▅▅▅▅▅. The claim is for a nerve conduction study and the service location submitted to Medicare is 4800 SW 8th St Miami, Florida.

According to Ms. ▅▅▅▅'s interview with HHS/OIG agents in 2013 she stated she had never been to Tampa, did not recognize Mr. Lovelace's picture, and had never received a nerve conduction study. There is no indication she was ever asked about or shown a picture of the service location on the actual claim.

On May 25, 2016 ▅▅▅▅▅▅ was interviewed by The Diaz Group and it again was able to confirm another patient had received the services as billed. (Ex A, pg 24-25)

**NV**: The defendant was convicted in Count 13 for billing Medicare for services not provided to ▅▅▅▅▅▅. The claim is for a nerve conduction study on 1/17/13 and the service location on the HCFA is 4800 SW 8th St Miami, Florida.

On June 9, 2016 ▅▅▅▅▅▅ was interviewed at her home and she stated she had never been contacted by any government agent in connection with this case. During the interview Ms. ▅▅▅ authenticated multiple signed medical records documents and stated she

---

[7] "Falsifying facts to establish probable cause is patently unconstitutional." *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004).

suffered from numbness and tingling and had a test done at the Merfi Corp clinic. (Ex A, pg 26-27)

**NP**: In Count 14 the defendant was convicted of billing Medicare for services not provided to ████████. The claim is for an ultrasound performed 1/31/13 and the service location on the HCFA is 4800 SW 8th St Miami, Florida.

On May 23, 2016, The Diaz Group interviewed Ms. ████ and she authenticated signed medical records from Merfi Corp and recalled she had been to the Coral Gables area to have tests performed.  Throughout the interview Ms. ████ continued to repeat that federal agents had visited her and told her that her identity had been stolen and used at a clinic in Tampa.  Again, The Diaz Group has identified additional evidence that Ms. ████ received the billed services.

**AC**: In Count 15, the Defendant was convicted of having billed Medicare for services not provided to ██████████.  The claim is for an echocardiogram performed on the patient on 2/4/13 and the service location on the HCFA is 4800 SW 8th St Miami, Florida.

On December 9, 2013 HHS/OIG agents interviewed Mr. ██████ and he stated he had never been to Tampa and had never heard of David Brock Lovelace and did not recognize his picture.  He stated he did not receive an echocardiogram on or around 2/4/13.

On May 10, 2016 Mr. ██████ was interviewed at his home by The Diaz Group.  Mr. ██████ authenticated his signature and fingerprint on medical records dated 2/4/13.  Again, this evidence supports the conclusion that Mr. ██████ received the billed services.  (Ex A, pg 28-29)

**GR**: The Defendant was convicted in Count 16 for having billed Medicare for services not provided to ██████████.  The claim is for an echocardiogram performed on 2/4/13 and the service location on the HCFA is 4800 SW 8th St Miami, Florida.

The Diaz Group was again able to confirm that the beneficiary was asked confusing questions by federal agents in this case unrelated to the actual claim.

The Diaz Group was again able to confirm that the beneficiary received the services as billed.

(Ex A, pg 30-31)

**MC**: The Defendant was convicted in Count 17 for billing Medicare for a "dead" beneficiary. The claim is for an ultrasound performed on ███████████ on 3/14/13.  The service location on the HCFA is 4800 SW 8th St Miami, Florida. The claims data generated by the government displays materially altered date of birth, social security number, and home address from the claim. The billed HICN number is one digit off the correct number– the "4" in the correct HICN was mistakenly listed as a "0" on the claim. Instead of rejecting the claim, the claim was changed[8] to a completely different HICN number assigned to a dead beneficiary with the same first and last name, although the actual beneficiary uses middle initial C.

Ms. ███████ was never contacted by the government.  She was interviewed by The Diaz Group at her home address listed on the Medicare claim on May 10, 2016.  Ms. ███████ stated that she is alive and that the death certificate is most certainly for another person.  Ms. ███████ stated she specifically remembered the ultrasound tests on her legs.  (Ex A, pg 31-33)

**AA**: The counts charge that Mr. Lovelace, through Summit health, billed Medicare for services not provided to ███████████ performed on 7/22/13.  The service location on the HCFA is 4800 SW 8th St Miami, Florida.

On March 13, 2014 HHS/OIG agents interviewed Mr. ███████ and he stated he had never heard of Summit Health, he did not recognize photographs of the offices in Tampa, he had never

---

[8] According to 42 CFR 424.32(d)(1)(i) a claim is "the transmission of the request to receive payment." The information should not change. "The falsity of a claim is determined at the time of submission." *United States v Southland Mgmt Corp*, Supra.

heard of David Brock Lovelace and did not recognize his picture. He stated he received all his medical care since 2010 in the Miami area.

On May 10, 2016 Mr. ████████ was interviewed by The Diaz Group at his home. According to the patient and his mother who was present during the interview, Mr. ████████ was robbed and beaten during a business trip to Costa Rica and now suffers from brain damage. The federal agent in this case never noted that Mr. ████████ suffered from brain damage and the Defense was not provided this information.

Mr. ████████ authenticated signed medical records dated 7/22/13 but was unclear about more details and his memory was clearly unreliable.  (Ex A, pg 33-34)

**DS**: The defendant was convicted in Count 19 for billing Medicare for services not provided to ████████. The claim is for an ultrasound performed on 7/22/13 and the service location on the HCFA is 4800 SW 8th St Miami, Florida.

Again, The Diaz Group was able to confirm Ms. ████████ recognized the service location on the claim and that she remembered having the ultrasound tests on her legs.  The evidence supports the conclusion she received the billed services.  (Ex A, pg 35)

On October 24, 2016 The Diaz Group and Undersigned Counsel attended a meeting with the US Attorney's office Middle District of Florida, Senior DOJ Trial Attorney Chris Hunter, plus senior DOJ personnel from Washington DC to present and discuss the newly discovered evidence. After the presentation and hearing all feedback from the government, The Diaz Group stands by its Report and its newly discovered evidence. "The defense's post trial investigation performed clearly establishes Mr. Lovelace's actual innocence of the charges brought against him." (Ex A, Pg 11)

## IV. FALSE DECLARATIONS BEFORE GRAND JURY

### Memorandum of Law

"As a general matter, to establish prosecutorial misconduct for the use of false testimony, a defendant must show that the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony, and that the falsehood was material. When the alleged prosecutorial misconduct occurs in the context of a Grand Jury proceeding the court dismisses the indictment only when the misconduct substantially influenced the Grand Jury's decision to indict or when there is grave doubt that the decision to indict was free from substantial influence of such violations."

*United States v. Cavallo,* 790 F.3d 1202, 1219 (11th Cir. 2015) (internal citations omitted)

Prejudice is not required to be shown, however, if the error has so compromised the

structural protection of the Grand Jury as to render the proceedings fundamentally unfair, in

which case there is a presumption of prejudice. See *United States v. Cavallo,* supra.

In a pre-trial motion to unseal the Grand Jury transcripts, the Defendant accurately

asserted that the Government built its case upon false evidence and false testimony.  Now with

the Grand Jury transcripts in hand and based on the newly discovered evidence from The Diaz

Group, the Defendant can confirm that the Grand Jury testimony by Agent Bledsoe procured by

AUSA Chris Hunter is false in its entirety. Where the government uses or elicits false testimony

during criminal proceedings, it will not amount to prosecutorial misconduct unless the prosecutor

either: (1) knowingly used perjured testimony; or (2) failed to correct what he later learned to be

false testimony. *United States v. McNair,* 605 F.3d 1152, 1208 (11th Cir.2010). Even then, the

testimony must be material. *Id.* at 1208–11 (holding that prosecutorial misconduct did not occur

because there was nothing to suggest that the testimony actually was false). "If prosecutorial

misconduct occurs in the context of a grand jury proceeding, the proper remedy is to dismiss the

indictment." *United States v. Pendleton*, 447 Fed. Appx. 978, 980 (11th Cir. 2011). "However,

where the Government presents false testimony *to the grand jury,* the indictment may be

dismissed only if the testimony is knowingly sponsored by the Government and material to the decision to indict. A statement is material if it is capable of influencing the factfinder with regard to the issue before it." *United States v. Forte*, 65 Fed. Appx. At *6 (5th Cir. 2003).

During the Government's presentation to the Grand Jury, Agent Bledsoe testified falsely about all material elements related to probable cause. When asked about the substantive healthcare fraud counts, Agent Bledsoe testified that all the counts were for services billed to people who never received the service, or for patients who were deceased at the time and could not have received it. (Grand Jury Tx. 21:25 – 22:9) Agent Bledsoe testified under oath that all Cornerstone health claims were "fictitious" and "that they never happened." ." (Grand Jury Tx. 23:20 – 24:2)   Agent Bledsoe testified falsely that Cornerstone and Summit had billed previously deceased patients identified in the substantive counts "as if they came in and received a service." ." (Grand Jury Tx. 20:25 – 21:1) Agent Bledsoe made false statements about service location, telling the Grand Jury that Summit Health submitted claims showing "that services purportedly were being rendered in the office in Tampa." (Grand Jury Tx. 16:8–24) Agent Bledsoe falsely testified to the Grand Jury that 99% of the beneficiaries lived at least "four hours away from the place they were getting services allegedly." . (Grand Jury Tx. 18:10-20) Agent Bledsoe also testified falsely that 100% of Cornerstone health's claims were for services rendered at its Lakeland office, and that all of the services billed required the physicians' actual physical presence to render the services. (Grand Jury Tx. 15:4 – 16:7) Agent Bledsoe testified he surveilled the Summit health office, stating that each time he watched the facility, the place was closed and locked during business hours, despite allegedly doing millions of dollars of services. (Grand Jury Tx. 25:9 – 25:21)

The Diaz Group established in its Investigative Report that Summit's Tampa office was never a service location for claims submitted to Medicare. The more interesting point of Agent Bledsoe's false declaration concerns his assertion that he personally visited the Tampa location during the time it was actively billing Medicare. Agent Bledsoe accurately noted early in his Grand Jury testimony that Summit stopped billing Medicare in August 2013. Agent Bledsoe testified at trial that he did not believe he started work on this case until after the Merfi Corp office in Miami closed - Merfi Corp was last open to see patients on or around September 28 2013. Even allowing for some inadvertence in Agent Bledsoe's testimony regarding when he started working on this case, it is dubious at best that Agent Bledsoe was at Summit's Tampa office "a number of times" while Summit was actively billing Medicare. Agent Bledsoe testified he also did surveillance at Cornerstone's office in Lakeland and identified that the clinic is either not open or he sees no patient activity despite the alleged claims of millions of dollars of services at the location. (Grand Jury Tx.25:22 – 26:7)

Again, The Diaz Group confirmed that no claims were submitted to Medicare for South Florida patients indicating the Lakeland address as a service location and a local South Florida service location was specifically identified on every claim. Interestingly, Agent Bledsoe accurately noted in this testimony that Cornerstone stopped billing Medicare in November 2012 - a full ten or eleven months before he testified that he started work on this case. Also, the defendant's discovery information provided by the government includes internal investigation documents that note the referral for investigation on this project started several months after the beginning of 2013. It appears clear that Agent Bledsoe intended to testify to the Grand Jury that he had been to Cornerstone's Lakeland office while it was actively billing Medicare and is

supporting probable cause by saying the volume of patients does not support the volume of billing.  Agent Bledsoe's statement is materially false.

"It is axiomatic that the Grand Jury sits not to determine guilt or innocence but to assess whether there is an adequate basis for bringing a criminal charge." *United States v. Williams*, 506 U.S. 36, 51 (1992). "Where the government uses or elicits false testimony during criminal proceedings, it will not amount to prosecutorial misconduct unless the prosecutor either: (1) knowingly used perjured testimony; or (2) failed to correct what he later learned to be false testimony." *United States v. Pendleton,* 447 Fed. Appx. 978, 980 (11th Cir. 2011). The United States Court of Appeals for the 11th Circuit "reverses a Grand Jury indictment when a false testimony error substantially influenced the Grand Jury's decision to indict, or when there is grave doubt that the decision to indict was free from such substantial influence of such violations." *United States v. Verbitskaya,* 406 F.3d 1324, 1336 (11th Cir. 2005).

**Patient NV** alerted The Diaz Group that she was never interviewed by any government agent in connection with this case. Agent Bledsoe testified he personally spoke to all purported "live" patients represented in the substantive counts.(21:9 21:21) The Diaz Group confirmed that all patients in the substantive counts actually received the services they were billed for - and have identified patients that were never asked by the Government if they received services.

The Government's basic argument, to account for its many material false statements about the claims submitted by the defendant, is that throughout its entire investigation neither an experienced healthcare investigator who works directly for HHS or an experienced DOJ healthcare prosecutor ever actually looked at the claims.  They would have this Court believe that they relied on a spreadsheet compiled by an arm of the prosecution team.  The spread sheet is inherently identified as not meeting the legal definition or the case law definition of "claims".

A Medicare claim is defined as a transmission of a request to obtain payment. The FCA defines "claim" to include any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. Whether a defendant has made one false claim or many is a fact-bound inquiry that focuses on the specific conduct of the defendant. *United States v. Krizek*, 111 F.3d 934, 939 (D.C. Cir. 1997) "Our conclusion that the claim in this context is the HCFA 1500 form is supported by the structure of the form itself.". *Id.* at 940. "It is conduct of the medical practitioner, not the disposition of the claims by the government, that creates FCA liability." *Id.* "The gravamen of these cases is that the focus is on the conduct of the defendant." *Id* at 939.

In a pre-trial dismissal motion, the defendant argued that the claims data generated by the government is materially altered and the defendant is prejudiced by this misconduct. In his dismissal motion response, Mr. Hunter acknowledged that the claims data the government used throughout this case are not claims submissions by the defendant, but rather adjudications of the claims the defendant submitted. In other words, the claims data information is not claims at all and was used in direct contradiction of controlling case law. In spite of his acknowledgement, Mr. Hunter also inexplicably asserted that the government claims data documents are the official claims of this case: "The certified Medicare claims data records, not the billing information Lovelace caused to be typed into Cook's computer program, are the official records of the Medicare claims." United States Response in Opposition to In Camera Motion to Dismiss Indictment at p.8.

It is apparent through the results of The Diaz Group Investigative Report that the defendant is prejudiced by the use of these altered federal records. Each line of government generated claims data omits the specific service location information that was submitted on every claim and the government used and capitalized on this omission to create its case. The prosecution team also identified a small group of claims data that includes altered patient names, altered Medicare numbers, altered dates of birth, and altered home addresses and has capitalized on these alterations to charge the defendant with billing "dead" beneficiaries. The Diaz Group Investigative Report plainly illustrates that the defendant did not bill "dead" beneficiaries at all and the patients who were billed actually received the services.

Using and continuing to use such plainly altered federal records and calling them the official claims of this case is outrageous. The government generated claims data MS Excel spreadsheets specifically identify the information contained herein as the Final Determination of the claims (interestingly the language used in the document is not actual language used by Medicare). The prosecution team knew, or should have known, from the outset that its information never met the legal definition of Medicare claims. Additionally, all of the payment amounts displayed in the claims data for South Florida residents are clearly made at Miami payment rates confirming that Medicare properly received the Miami service locations on every claim. This is the only information in the claims data that directly relates to the service location billed on every claim.

## V. CONCLUSION

The Diaz Group Investigative report provides undeniable new evidence that the patients listed in the §1347 Counts of the Superseding indictment were rendered services as billed. A review of the federal agent's investigative reports reveal the methodology utilized did not convey the activities or services rendered on behalf of the defendant and his associated companies. The federal agents based its case on the lack of ability of beneficiaries to pick out the defendant's photograph and photographs of his Correspondence Address administrative office in Tampa and therefore the claims of services rendered were fraudulent. Federal agents also used this deceptive tactic to improperly acquire search warrants for the Defendant's home, offices, and cell phone to further make its case at trial. During the Diaz Group investigation of the services not rendered claims, the investigation was clearly able to establish that beneficiaries did in fact receive the care and testing at physician's offices as billed. The methodology used by the federal agents appears to have misled the beneficiaries that the claimed services were provided by the Defendant personally and at his Tampa administrative office.

The Prosecution team and subsequent indictment also alleged the Defendant billed for services provided to deceased individuals. These alleged deceased patients were identified, located, and interviewed using medical records and claim information clearly available to federal agents.

The Defense put forth arguments in pre-trial motions and at trial that the deceased individuals were never billed at all which the Government asserted was absolutely false. The fact that these people are alive and have sworn affidavits is evidence that could not have been discovered through reasonable efforts in the short period of time allotted from the discharge of Mr. Lovelace's prior counsel for emergency reasons. Prior counsel had undertaken a significant investigative effort, however when prior counsel left the case, Mr. Lovelace lost all the results of

that investigative effort. Undersigned Counsel also personally began an investigation effort but truly could not complete such a comprehensive task in such a short period of time while also preparing to review the many thousands of pages of documents placed in discovery by the Government. This newly discovered evidence meets the five requirements as described by the *Vargas* court, and at a minimum merits an evidentiary hearing.

WHEREFORE the Defendant, David Brock Lovelace, hereby prays that this Court will enter an indicative order to the 11th Circuit indicating this motion either likely to be granted or presents a substantial issue pursuant to Fed. R. App. P. 12.1. Additionally, the Defendant requests that this Court grant the Defendant immediate release from incarceration pending the final disposition of this case.

## MOTION FOR PROTECTION

Undersigned Counsel respectfully requests that if This Court desires a hearing on this motion, that the Court protect her from January 23 through February 11, as she has a trial in Pasco County and a pre-arranged vacation out of state during that time.

Respectfully submitted,

*s/Darlene Calzon Barror*
DARLENE CALZON BARROR, ESQUIRE

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been

furnished electronically by CM/ECF system which will send an electronic filing to all counsel of

record, this 17th day of January 2017.

_s/Darlene Calzon Barror_
DARLENE CALZON BARROR, ESQUIRE
506 North Armenia Avenue
Tampa, Florida 33609
(813) 877-6970
(813) 879-2610
Darlene@BarrorLaw.com
Attorney for Defendant
Florida Bar No. 0860379