UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA
v.                                                    CASE NO. 8:14-cr-00164-SDM-AAS
DAVID BROCK LOVELACE

### UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT DAVID BROCK LOVELACE'S MOTION FOR NEW TRIAL

The United States files this response in opposition to Defendant David Brock Lovelace's Motion for New Trial ("Motion") and respectfully requests that the Court deny Lovelace's Motion. Lovelace's Motion is demonstrably meritless. Lovelace and his co-conspirators executed a long-running, well-concealed health care fraud scheme and engaged in significant money laundering of fraud proceeds. Following a comprehensive two-week trial in December 2015, a jury convicted Lovelace and a co-defendant of all charges against them based on overwhelming evidence of their guilt. Lovelace now claims to have "newly discovered evidence" that warrants a new trial. He does not. Evidence at trial included, for each Medicare beneficiary referenced in Lovelace's Motion, *defense exhibits* containing purported medical records that the United States had provided in discovery and *defense-characterized claims data information*. Evidence at trial also included *defense expert testimony* offered in service of Lovelace's defense theories that he repeats in his Motion. Lovelace and his team either ignore or misrepresent all the trial exhibits, all the trial testimony, all the discovery, and the actual charges in the case and the evidence supporting them to once again make an unfounded attack on the United States. Evidence of Lovelace's guilt is so direct and overwhelming—his fraud and deceit is so pervasive—that a new trial would not produce a different result. Lovelace's Motion not only is time-barred, as it is merely a regurgitation of theory of defense arguments. It also fails the test for a new trial based on purportedly newly discovered evidence. His Motion should be denied.

## INTRODUCTION

The deadline for filing a motion for new trial based on insufficient evidence or the interests of justice has long since passed. As a result, Lovelace characterizes his Motion[1] as one based on "newly discovered" evidence but proceeds to argue the sufficiency of the evidence, his defense theories, and (once again) make vitriolic attacks on the United States. Yet Lovelace fails to disclose to the Court that he introduced into evidence at trial purported medical records and/or claims data information for *all* of the Medicare beneficiaries identified in his Motion. He ignores that he presented expert testimony at trial to advance his own interpretation of the evidence, especially the Medicare claims activity. He pretends that facts about physicians not rendering services to patients—contrary to what Lovelace had represented to Medicare—were not before either the grand jury or the petit jury. Lovelace's instant Motion is a repackaging of the same arguments he has made before, mischaracterizing the charges and the evidence supporting the charges while ignoring the testimony and exhibits, including his own, presented during trial.

This Court has thoughtfully and correctly ruled on Lovelace's off-base arguments every time he has made them. For example, Lovelace in his *Franks* motion (DE 304) argued the same defense theories that he argues in the instant Motion, including that Medicare beneficiaries were alive, as if the charges or any one of them rises or falls depending on a beneficiary's vital status. They do not. In the United States' response to Lovelace's *Franks* motion (DE 318), the United States reviewed in detail the identifying information of the beneficiaries in question, the independent sources of information about a beneficiary's identifying information and vital status, and what the Medicare claims data records showed. The United States also reviewed ways in which Lovelace executed his fraud scheme and previewed evidence that would be presented at

---

[1] Lovelace's counsel certifies in the Motion, which she first filed under seal January 3, 2017, that the Motion was served via the CM/ECF system on January 3, 2017. That is incorrect. In fact, it was served via email late in the afternoon of January 4, 2017. Pursuant to this Court's Order, she filed a redacted version of the Motion at DE 542.

trial, all of which had been produced in discovery.  The Court denied Lovelace's *Franks* motion (DE 347), accurately observing that "much of the substance in Lovelace's motion and the United States' response is merely a re-statement of the differences between the defense's and the prosecution's interpretation of the evidence, the resolution of which difference is the business of the jury."  Though Lovelace disagreed with the meaning and interpretation of the evidence and the charges against him, he presented his disagreement to a jury at trial with vigor, not merely cross-examining witnesses, but calling his own witnesses, including expert witnesses, and introducing his own exhibits, including exhibits that belie his claims in the instant Motion.

Lovelace, and his defense counsel, not only try to play "hide the ball" in the instant Motion, they did the same with their own post-trial investigators.  The Diaz Group, by its own admission, did not review the trial transcripts, trial exhibits, or the discovery.  The Diaz Group, by its own admission, was told that Lovelace was convicted in Counts 2 through 6, 11, and 17 based on whether a Medicare beneficiary was dead or alive.  The Diaz Group, by its own admission, was told that Lovelace was convicted in Counts 7, 8, 10, 12, 13, 14, 15, 16, 18, and 19 based on whether a Medicare beneficiary said he or she received services or not.  The Diaz Group completely misapprehends what the actual charges in the case were and what the actual— and overwhelming—evidence was to support each and every one of the charges.

Count 16 is illustrative.  Count 16 (which was Count 18 in the original Indictment) charges Lovelace with a scheme and artifice to defraud Medicare and to obtain money from Medicare by means of materially false and fraudulent pretenses, representations, and promises in violation of 18 U.S.C. § 1347.  Count 16 did not, nor did any other count, ever charge Lovelace merely with a criminal false claim in violation of 18 U.S.C. § 287.  With respect to Count 16, Lovelace claimed to Medicare that Dr. T.F. had been the rendering provider of services to

Medicare beneficiary G.R. on behalf of Summit Health Specialists which Lovelace enrolled into the Medicare program identifying one and only one practice location in Tampa.

That is completely and totally fraudulent in several ways, as the evidence showed.  For example, Dr. T.F. testified that he did not render any medical services to any patients at or on behalf of Summit Health Specialists—not G.R., not anyone else—not in Tampa, not anywhere.

They also either did not know or chose to ignore these facts: the United States produced in discovery 157 pages of purported medical records for G.R., and the defense introduced into evidence at trial as defense exhibit 30 all 157 pages of the medical records, not the merely the six pages the Diaz Group references.  Defense trial exhibit 30 is submitted herewith as Exhibit A. The United States also produced in discovery—*on June 11, 2014, a year and a half before trial*—the report of interview of Medicare beneficiary G.R.

Lovelace and his team have not presented "newly discovered evidence."  Instead, Lovelace picks up where he left off, arguing over the meaning and sufficiency of the evidence, attacking the United States, and misrepresenting the charges and the evidence supporting them. At all times, including the instant Motion, Lovelace has demonstrated a willingness to say and do anything—and procure others to say and do anything—in order to try to get away with his crimes and cover up his schemes.[2]

---

[2] With Lovelace's Motion, Lovelace's counsel, Ms. Barror, submits purported affidavits wrongly implying that Lovelace has at all times maintained his innocence.  In fact, on December 16, 2015, days after the jury found Lovelace guilty of every single charge against him, Ms. Barror emailed a letter to the undersigned, writing "Lovelace wanted me to send you the attached letter[,]" proposing that Lovelace provide information about criminal activity with the hope of reducing his prison sentence.  In the letter, Ms. Barror wrote "I believe Mr. Lovelace can make up to the Government his wrong doings by his wealth of information[,]" which she summarized: "Part D medicare [*sic*] and home deliveries that are billed, are never distributed[;]" "how studies are being made to look worse than they are to allow for invasive therapies[;]" "He also knows the work around for 'not amenable to surgical intervention'[;]" he has "personal information" about four pending federal criminal cases in Miami and information about how new Medicare recipients are being "targeted." Ms. Barror characterized Lovelace's information about this criminal activity as just the "tip of the iceberg of his knowledge."

## FACTUAL AND PROCEDURAL SUMMARY

Lovelace was first indicted, along with Terri Schneider ("Schneider"), Gregory Sylvestri ("Sylvestri"), Leonard Austin ("Austin"), and Illya Jackson ("Jackson"), in April 2014 on conspiracy, health care fraud, and money laundering charges arising out of a fraud scheme executed over several years through Cornerstone Health Specialists, Summit Health Specialists, Coastal Health Specialists, DBL Management, BONB d/b/a Bioscan, and other entities. Sylvestri and Austin, two of Lovelace's co-conspirators, pleaded guilty to conspiracy to commit money laundering involving health care fraud proceeds and, in February 2015, were sentenced, after which a Superseding Indictment was returned. Jackson pleaded guilty to a bankruptcy fraud charge in November 2015. Lovelace and Schneider proceeded to trial. Following a two-week trial, characterized by a comprehensive presentation of evidence, including the presentation of defense exhibits and defense witnesses, the jury found Lovelace guilty of all 28 charges[3] against him, and found Schneider guilty of all 22 charges against her.

The jury's guilty verdict, swift and sweeping, was based on the overwhelming quality and quantity of evidence of Lovelace's criminal activity. The United States introduced 212 exhibits (DE 382) and presented testimony from twelve witnesses. Evidence included testimony of physicians whose identifying information Lovelace misappropriated and whose signatures Lovelace forged in order to steal from Medicare and conceal his fraud. Evidence included testimony of Sylvestri, Austin, and Isabel Medina ("Medina"), three of Lovelace's co-conspirators who had pleaded guilty to charges relating to the scheme. Each of them testified

---

[3] Specifically, the jury found Lovelace guilty of the following:
- Count 1, conspiracy in violation of 18 U.S.C. § 1349, both objects to execute a health care fraud scheme and to execute a wire fraud scheme;
- Counts 2-19, health care fraud in violation of 18 U.S.C. § 1347;
- Count 30, conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), both objects of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and 18 U.S.C. § 1957;
- Counts 31-37, money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and
- Count 40, aggravated identity theft in violation of 18 U.S.C. § 1028A.

about Lovelace's fraudulent conduct throughout the scheme.  Evidence included financial records showing the receipt and laundering of nearly $3 million in fraud proceeds.

### A.   The evidence of Lovelace's guilt of all charges was overwhelming.

Five physicians testified during trial that they did not render services to patients, contrary to what Lovelace claimed to Medicare.  These physicians also testified that their signatures had been forged on reassignment of Medicare payment documents Lovelace caused to be submitted to Medicare in furtherance of his fraud scheme.

For example, Dr. T.F. testified that he did not render any services to any patients on behalf of Lovelace's Summit Health Specialists.  Yet Lovelace caused claims to be submitted to Medicare representing Dr. T.F. as the rendering provider of approximately 6,528 services to 2,417 patients and seeking reimbursement of approximately $2,515,985.  Medicare paid approximately $513,903 to Lovelace based on these fraudulent claims.

> Q: Before we start working through this and other exhibits for Summit Health Specialists, could you please tell the jurors whether you ever saw any patients?
> A: No, I did not.
> Q: Did you ever travel from Melbourne, Florida, to Tampa to see a single patient for Summit Health Specialists?
> A: No, I did not.
> Q: Did you ever read any test results for Summit Health Specialists?
> A: No.
> Q: Did you ever render any services to any patients for Summit Health Specialists?
> A: No.
> Q: And going across, do you see where it indicates that according to Summit Health Specialists claims data records you were the rendering provider of 6,528 services on behalf of Summit Health Specialists to 2,417 patients.
> A: Yes.
> Q: You see that?
> A: Yes.
> Q: Did you do that?
> A: No.
> Q: Did you see any patients on behalf of Summit Health Specialists?
> A: No.

Trial Transcript, Dr. T.F., Dec. 7, 2015, at p. 17, lines 9-18, 23-25; p. 20, lines 13-24.

Dr. R.N. testified in reference to a series of exhibits containing Medicare reassignment of payment documents about the fraudulent nature of those documents, including how his signature was forged.  Dr. R.N. did not reassign his Medicare payments, he did not sign the reassignment documents, and he did not authorize Lovelace or anyone else to sign them.  See Trial Transcript, Dr. R.N., Dec. 7, 2015, at p. 81, lines 19-25; p. 82, lines 1-25; p. 83, lines 2-9.

Ms. T.O., who worked briefly for Lovelace in an administrative role, testified that Lovelace told her he forged physician signatures—including Dr. R.N.'s—and ordered her not to contact physicians to verify information necessary for insurance enrollment.  When Ms. T.O. learned this, she quit working for Lovelace.  See Trial Transcript Ms. T.O., Dec. 10, 2015 p.m. session, p. 86, lines 4-10, 21-25; p. 87, lines 1-11.[4]

Dr. P.R. and Dr. T.D. also testified that their signatures were forged on documents that Lovelace and Schneider caused to be submitted to Medicare reassigning those physicians' Medicare benefits to Cornerstone Health Specialists, which Lovelace and Schneider controlled. They also testified that they did not render services to any patients at Cornerstone Health Specialists or anywhere else, even though Lovelace and Schneider claimed to Medicare that these physicians had rendered thousands of services to over 2,000 patients, which resulted in Lovelace and Schneider receiving over $1 million in fraud proceeds.

For example, Dr. T.D. testified that he did not render services to any patients anywhere— not Lakeland, not Tampa, not Melbourne, not Miami, not anywhere—on behalf of Lovelace or Lovelace's entities.

Q:     Did you ever see any patients at a clinic called Cornerstone Health Specialists?
A:     No.

---

[4] Even Lovelace's attorney admitted in closing argument that Lovelace forged physicians' signatures, including Dr. Newman's.  "…I think we can talk about the fact that Mr. Lovelace should not have written Dr. Newman's name on something.  That was a careless, reckless thing to do…."  Trial Transcript, Lovelace's closing argument, Dec. 11, 2015, p. 124, lines 8-11.  Of course, she had no choice but to acknowledge the evidence of Lovelace's forgeries.

Q:     Did you ever see any patients at a clinic called Summit Health Specialists?
A:     Absolutely not.
Q:     Did you ever see patients at a clinic called Coastal Health Specialists?
A:     No.
Q:     Did you ever see any patients at an entity called Merfi Corp?
A:     No.
Q:     Did you ever render services to patients on behalf of Cornerstone Health Specialists?
A:     No.
Q:     Did you ever render services to patients on behalf of Summit Health Specialists?
A:     Never.
Q:     Did you ever render services on behalf—to patients on behalf of Coastal Health Specialists?
A:     No.
Q:     Did you ever render services to patients on behalf of Merfi Corp?
A:     No.
Q:     Did you ever physically supervise anybody rendering services to patients for any any of those entities?
A:     No.
Q:     Did you ever travel to Miami to see any patients on behalf of those entities?
A:     Absolutely not.
Q:     Did you ever travel to Miami to supervise anybody—
A:     Never.
Q:     --seeing patients on behalf of any of these entities?
A:     No, I did not.
Q:     Did you render or provide 6,951 services on behalf of Cornerstone Health Specialists to Medicare beneficiaries?
A:     No, I provided zero number of services.
Q:     Did you personally see or otherwise supervise somebody who saw 1,270 Medicare beneficiaries at or on behalf of Cornerstone Health Specialists?
A:     No.

Trial  Transcript, Dr. T.D., Dec. 4, 2015, p. 11, line 25; p. 12, lines 1-25; p. 13, lines 1-8; p. 23, lines 11-17.

Lovelace  touted  his  ability  to  forge  and  falsify  anything,  as  co-conspirator  Sylvestri

testified  and  illustrated  with  Wells  Fargo  Bank  letters  that  Lovelace  fabricated  and  sent  to

Sylvestri.   In the letters, exhibits 119 and 120 at trial and submitted herewith as Exhibits B and

C,  Lovelace  created  two  letters  on  Wells  Fargo  Bank  letterhead  attesting  on  behalf  of  Wells

Fargo Bank that Sylvestri had millions of dollars in Wells Fargo Bank accounts, which Lovelace

and Sylvestri knew was false.  Lovelace forged the signature of a Wells Fargo employee on one

of the letters.   Sylvestri testified that Lovelace told him "with the software he had on his computer he can fabricate documents, letterhead like you just saw, or reports from doctors or an attorney.  He can manipulate the verbiage on documents…[and] for any kind of signature, he can duplicate."  Trial Transcript, Sylvestri, Dec. 3, 2015, p. 144, lines 14-25; p. 145, lines 1-15.

In the same text message exchange that Sylvestri had with Lovelace about the fake Wells Fargo Bank letters, Lovelace told Sylvestri it was easier on Lovelace to bill Medicare for services not rendered as long as people lie to cover up the fraud.  This text exchange was government's trial exhibit 123-2 and is submitted herewith as Exhibit D.  In it, Lovelace advises Sylvestri that "It doesn't matter" whether Medicare claims are legitimate or whether physicians ever read diagnostic test results, in response to Sylvestri asking, "Is it more legit if the doc we are billing through reads some for us?"   "That's the wrong ques" Lovelace replied to Sylvestri.  Instead, Lovelace texted to Sylvestri, the doctor "just has to say its legit if somebody asks."

Indeed, there were no limits to what Lovelace and Schneider were willing to do to execute and conceal their fraud.  For example, Schneider emailed Lovelace a PDF attachment where the subject was "Art work" and the name of the PDF attachment was "Art in the Park."  This was government trial exhibit 152 and is submitted herewith as Exhibit E.  In the body of the email, Schneider wrote to Lovelace about the "art project" they discussed and wanted his opinion on a "sample of it," attaching the "Art in the Park" PDF—a fabricated Merfi Corp. progress note.

Lovelace also arranged for a sham lease with Medina in order to conceal illegal kickbacks he was paying in exchange for access to the fraud roundhouse that was Merfi Corp. The sham lease was government trial exhibit 129.  Medina testified that the lease, which Lovelace had prepared and signed on behalf of Cornerstone Health Specialists, was to make it easier for Lovelace to pay illegal kickbacks so he would not have to withdraw as much cash.  See

Trial Transcript of Medina's testimony, Dec. 7, 2015, p. 137, lines 16-25; p. 138, lines 1, 23-25. All of the bogus "rent" checks were government trial exhibits, numbered 130-142, signed by Lovelace, payable to Merfi Corp., out of a Cornerstone Health Specialists bank account that Lovelace and Schneider controlled. The "rent" checks and cash kickbacks ended when Medina was arrested in September 2013 on health care fraud charges arising out of Merfi Corp.

### B.       Lovelace presented a defense case at trial that belies claims in his Motion.

In addition to cross-examining government witnesses at trial, Lovelace presented evidence in the form of exhibits and testimony—including expert testimony—precisely on the topics he covers in his Motion. Yet he ignores all of this in his Motion or otherwise disingenuously mischaracterizes the evidence that was presented.

For example, Lovelace in his Motion argues that the Tampa location of Summit Health Specialists and the Lakeland location of Cornerstone Health Specialists were merely mail-drops only "known to Medicare as the 'Correspondence Address'."[5] That is demonstrably false.

In fact, Summit Health Specialists' Tampa location and Cornerstone Health Specialists' Lakeland location were reported to Medicare in 855B enrollment applications as the only "practice locations" for each clinic—the locations where patients were being seen and where services were being rendered. See Exhibit F attached hereto, a composite of government trial exhibits 47, 60, 61, 62, and 63. Each page of Exhibit F shows how Lovelace (and Schneider) identified Tampa and Lakeland—nowhere else—as the "Practice Location" for their clinics.

Lovelace presented expert testimony on this topic, and even Lovelace's expert agreed that the "Practice Location" section requires identifying where patients are receiving services. Lovelace's expert also acknowledged that any change in practice location must be reported to

---

[5] Motion at 4. Lovelace's Motion is not paginated. The page reference is to the PDF page.

Medicare through an updated 855B, not through an individual claim.  See Trial Transcript, Christopher Parrella ("Parrella"), Dec. 9, 2015, p. 108, lines 1-10.

Lovelace's Motion reflects a reckless disregard for the trial record, not merely the affirmative evidence of his guilt, but also his own expert's testimony and his own exhibits.  That is, Lovelace introduced hundreds of pages of medical records purporting to show that Medicare beneficiaries—the same ones he references in his Motion—received services.  Lovelace also introduced his own claims data information purporting to show that services associated with these beneficiaries were legitimately billed.  The table submitted herewith as Exhibit G shows the Medicare beneficiary's initials, the defense trial exhibit number and type, and the count in which that beneficiary's initials appear.  All of these referenced defense trial exhibits, which total hundreds of pages, are being submitted herewith as Exhibits A, H, I, J, K, L, M, and N.

Lovelace's Motion also ignores the trial evidence relating to Lovelace's forgeries of physicians' signatures, misappropriation of their identifying information, and illegal kickback activity.  Perhaps wishing away that evidence should not be surprising considering Lovelace's own expert witness testified about the illegality of precisely what Lovelace did.  See Trial Transcript, Parrella, Dec. 9, 2015, p. 108, lines 11-25; p. 109, lines 1-16.

At the conclusion of the trial, the jury's  verdict—a swift, sweeping verdict of guilty on every single count against both Lovelace and Schneider—demonstrates the jury emphatically rejected Lovelace's defense theories even though he introduced medical records and defense-characterized claims data information for every beneficiary referenced in his Motion.

## **DISCUSSION**

Rule 33(b)(1) of the Federal Rules of Criminal Procedure requires a motion for new trial based on purportedly newly discovered evidence to be filed within three years of a jury's verdict.

Rule 33(b)(2) requires all other motions for new trial to be filed within fourteen days after the verdict.  Since Lovelace's Motion is based on grounds other than purportedly newly discovered evidence—relitigating settled issues and renewing theory of defense arguments—his Motion is time-barred and may not be considered.  See United States v. Campa, 459 F.3d 1121, 1153-54 (11th Cir. 2006) (en banc).  "A court may not consider motions for new trial based on any other argument than newly discovered evidence outside the [14-day] period.  'This deadline is rigid….[C]ourts 'may not extend the time to take any action under Rule 33 except as stated' in Rule 33 itself.'" Id. at 1154 (internal citations omitted) (affirming denial of motion for new trial).

Even if Lovelace's Motion is construed as one based on "newly discovered evidence," such motions "are highly disfavored in the Eleventh Circuit and should be granted only with great caution."  Id. at 1151.  The Defendant bears the burden of justifying a new trial based on "newly discovered evidence."  See id.

When a motion for a new trial is based on a claim of newly discovered evidence, the district court may grant a new trial only if (1) the defendant in fact discovered the evidence after trial; (2) the failure of the defendant to discover the evidence was not due to a lack of due diligence or care; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material to issues before the court; and (5) the evidence is of such a nature that a new trial would probably produce a different result.  See United States v. Thompson, 422 F.3d 1285, 1294 (11th Cir. 2005) (affirming denial of motion for new trial); United States v. Jernigan, 341 F.3d 1273, 1287 (11th Cir. 2003) (same).  A motion for a new trial must be rejected if any of those five requirements is not met, and a hearing is neither required nor necessary to determine if they are met.  See Thompson, 422 F.3d at 1294; Jernigan, 341 F.3d at 1289.  "As a matter of law, the trial court cannot grant a motion for a new trial based on newly discovered evidence once it has

determined that the movant has failed to satisfy any part of the five-part test." United States v. Reed, 887 F.2d 1398, 1404 (11th Cir. 1989) (affirming denial of motion for new trial); see also United States v. Lee, 68 F.3d 1267, 1274 (11th Cir. 1995) (stating "The failure to satisfy any one of those elements is fatal to a motion for a new trial.") (quotation marks omitted).

### A.     Lovelace's Motion fails the five-part test for a new trial.

Lovelace's Motion fails all five parts of the test for a new trial, as the foregoing review of the evidence demonstrates, though failing any one part is fatal to his Motion.

### 1.     Lovelace did not discover "new evidence" after trial.

Lovelace introduced into evidence at trial defense exhibits 18, 29, 30, 31, 32, 33, 34, and 37.  See Exhibits A and H through N.  These exhibits comprise several hundred pages of purported medical records and claims data information for each and every beneficiary described in Lovelace's Motion.  Lovelace used these exhibits to invite the jury to believe that claims submitted in the names of the identified beneficiaries were legitimate.  Lovelace also presented expert testimony to argue that claims submitted in the names of those beneficiaries were legitimate.  Just because a post-trial defense investigator who was in the dark about the actual evidence in the case found and interviewed beneficiaries who say they received some service from some physician—but not the physician claimed—does not make that information new evidence.  Lovelace already had introduced into evidence for the jury to consider medical records and claims data information for each of these beneficiaries.

### 2.     Lovelace cannot show he exercised reasonable diligence.

On June 11, 2014, one and a half years before trial, the United States provided discovery to Lovelace that included reports of interviews of beneficiaries M.P. (Count 7); A.A. #1 (Count 8); B.P. (Count 10); M.M. (Count 12); N.P. (Count 14); A.C. (Count 15); G.R. (Count 16); A.A.

#2 (Count 18); and D.S. (Count 19).  These reports of interviews, produced under a protective order because they contained PII, were not redacted in any way—they contained the beneficiary's name, date of birth, HICN/SSAN, telephone number, and address.  Thus, at any time prior to trial, any member of the Lovelace defense team had the ability to read what the beneficiary had stated when interviewed and contact the beneficiary to ask any further questions. Also on June 11, 2014, the United States produced in discovery fourteen certificates of death from the Florida Office of Vital Statistics for fourteen deceased individuals whose identifying information was present in Medicare claims data.  Again, for a year and a half prior to trial, any member of the Lovelace defense team at any time had the ability to analyze this information to make whatever arguments they wanted to try to make (even though a beneficiary's vital status was not and is not dispositive of any material fact).

> 3.      Lovelace cannot show that the "new evidence" is anything other
> than cumulative, impeachment material.

Five physicians testified at trial that they did not render medical services to any patients at or on behalf of Cornerstone Health Specialists, Summit Health Specialists, or Coastal Health Specialists at any location anywhere.  Yet Lovelace and Schneider caused reimbursement claims to be submitted to Medicare falsely and fraudulently representing that these five physicians had rendered thousands of services to patients for each of these clinics.  For example, not only did Dr. T.F. testify that he did not render services to any patients on behalf of Summit Health Specialists, he also testified that he viewed himself as a "silent partner" in Summit Health Specialists, not a clinical provider.[6]  Yet Lovelace represented to Medicare that Dr. T.F. had been the rendering provider of services to 2,417 patients on behalf of Summit Health Specialists.

---

[6]   Q: Dr. [T.F.], what was your understanding of what your role was at Summit Health Specialists?
      A: Well, I was more or less a silent partner.
Trial Transcript, Dr. T.F., Dec. 7, 2015, at p. 12, lines 15-17.

At best, Lovelace could have tried to impeach the testimony of the physicians with his purportedly "newly discovered" information. But he already tried to impeach them in several ways, rendering cumulative any further attempts at impeachment.  Regardless, even that would fail, because none of the beneficiaries received services from the physicians as claimed by Lovelace to Medicare.

4.      Lovelace cannot show that the "new evidence" is material.

Lovelace misrepresents the charges in Counts 2-19 and the evidence.  The jury convicted Lovelace on Counts 2-19 which charged a scheme and artifice to defraud a health care benefit program.  Evidence of Lovelace's scheme and artifice to defraud is extensive, and no count was based merely on whether a beneficiary was alive or dead, or whether a beneficiary stated they received a service or not.  For example, even if Lovelace had tried to call beneficiaries N.P. and A.C. to testify that they received a service—a dubious prospect considering that A.C. stated to Lovelace's investigator that he was a victim of identity theft and both N.P. and A.C. denied receiving claimed services—such testimony would be wholly immaterial.  The claims Lovelace caused to be submitted in their names represented to Medicare that "silent partner" Dr. T.F. had been the rendering provider of services to them, which, of course, he was not.  For this reason and all the other reasons made plain by the overwhelming evidence of Lovelace's fraud scheme, the information that Lovelace describes in his Motion is not material.

5.      Lovelace would still be found guilty of all charges at a new trial.

The evidence of Lovelace's guilt was so strong, so overwhelming, and so convincing that the jury took less than 90 minutes to return a sweeping five-page guilty verdict on all counts against him (and Schneider) even after a two-week trial that involved hundreds of exhibits and 21 witnesses.  Three of Lovelace's co-conspirators testified directly against him at trial, all with

independent corroboration.  Physicians testified how Lovelace misappropriated their identifying information and forged their signatures on official Medicare records which were admitted into evidence.  This evidence and the rest of the trial evidence demonstrates that a new trial would not produce a different result.  Instead, Lovelace still would be convicted of all counts.

### B.      Lovelace's allegations of false grand jury testimony are unfounded, and the petit jury's verdict reflects the overwhelming evidence of his guilt.

Lovelace misrepresents the evidence presented to the grand jury and the charges the evidence supports.  Evidence before the grand jury included, for example, testimony that physicians had stated they had not rendered any services to any patients at or on behalf of Cornerstone Health Specialists, and testimony that beneficiaries had stated they had not received any medical services from certain physicians—Drs. T.F., R.N., T.D., and P.R.  Yet Lovelace caused reimbursement claims to be submitted to Medicare on behalf of Cornerstone Health Specialists and Summit Health Specialists fraudulently representing otherwise.

Consider, for example, how Lovelace and Schneider misappropriated Dr. T.D.'s identifying information in furtherance of their conspiracy and scheme.  Lovelace and Schneider caused Cornerstone Health Specialists to submit false and fraudulent reimbursement claims to Medicare representing that Dr. T.D. had rendered approximately 6,951 services to approximately 1,270 patients—even though he did not.  Recall Dr. T.D.'s testimony.  Trial Transcript, Dr. T.D., Dec. 4, 2015, p. 23, lines 11-17.  Dr. T.D.'s trial testimony is substantively the same as the grand jury testimony.  Yet Lovelace and Schneider falsely and fraudulently caused reimbursement claims to be submitted to Medicare over a two-year period representing that Dr. T.D. and Dr. P.R. had been rendering providers of services to over 1,000 patients—including M.B. (Counts 2, 3, and 4); A.W. (Counts 5 and 6); M.P. (Count 7); A.A.#1 (Count 8); and J.H. (Count 9).

Similarly, evidence at trial about where Lovelace represented to Medicare services were being rendered to patients on behalf of Summit Health Specialists is substantively the same as the grand jury testimony.   Again, Section 4 of the 855B Medicare enrollment application is entitled "Practice Location Information."   Section 4 requires reporting to Medicare the address of the practice location where patients are being seen.   Section 4 also requires reporting the date on which Medicare patients were first seen at the identified practice location.   In every one of the Summit Health Specialists 855B Medicare enrollment applications that Lovelace caused to be submitted to Medicare, Lovelace identified only one address where patients were being seen: 15511 North Florida Avenue, Suite B3, Tampa, Florida.   The date Lovelace reported the first Medicare patients were seen at that location?   October 20, 2011 on two of the enrollment applications and August 27, 2012 on the other two enrollment applications.  Both are false.  The 855B Medicare enrollment applications for Summit Health Specialists were introduced into evidence at trial as government exhibits 60, 61, 62, and 63.  See composite Exhibit F.

In four successive Medicare enrollment applications, Lovelace represented to Medicare that the only location Summit Health Specialists ever provided services to patients—B.P. (Count 10); R.H. (Count 11); M.M. (Count 12); N.V. (Count 13); N.P. (Count 14); A.C. (Count 15); G.R. (Count 16); M.C. (Count 17); A.A.#2 (Count 18); and D.S. (Count 19) and any other patients—was 15511 North Florida Avenue, Suite B3, Tampa.   Those representations by Lovelace to Medicare were accurately relayed to the grand jury and are utterly false and fraudulent, made in furtherance of Lovelace's scheme and artifice to defraud.

Thus, irrespective of whether a beneficiary was alive or deceased, or whether a beneficiary received a service at Merfi Corp. in Miami from some Miami physician, the grand jury had evidence before it to conclude that there was probable cause to support the charges.

Throughout this case, Lovelace has tried to mischaracterize the health care fraud scheme charges as flowing from a basic binary determination: a beneficiary was alive or dead, or a beneficiary received a service from someone or not.  That is simply wrong.

Lovelace's fraud scheme was calculating, duplicitous, and multi-faceted.  For example, all the Medicare claims he caused to be submitted were fraudulent *ab initio*, because he enrolled his clinics into the Medicare program under false and fraudulent pretenses.  Doing so was part of his scheme and artifice to defraud, as the evidence established at trial.  As a result of the overwhelming evidence of Lovelace's multi-faceted criminal activity, the jury convicted Lovelace not only of two conspiracy counts, but also all substantive counts.

The jury's sweeping finding of Lovelace's guilt does not, of course, inhibit him from trying to argue once again that a handful of alleged database mismatches regarding deceased beneficiaries is somehow indicative of government deception or dispositive of material issues. They are neither.  Lovelace made the same arguments in his *Franks* motion that he renews here. The United States explained in great detail in its response to the *Franks* motion what the multiple, independent sources of information were that revealed the presence of deceased Medicare beneficiary identifying information in the clinics' claims data.  That is not deceptive— it is candid and sourced in an independently verifiable manner.  The claims data in fact contained billing for services rendered to deceased beneficiaries.  Whether a beneficiary was dead or alive, however, is not dispositive of any material issue, as the overwhelming evidence of Lovelace's extensive fraud scheme amply shows.

Counts 2, 3, and 4 relating to Medicare beneficiary M.B. are illustrative.  As previously detailed in the United States' response to the *Franks* motion, the name, Health Insurance Claim Number ("HICN"), and date of death for M.B. in the referenced Cornerstone Health claims data

match the name, Social Security Administration Number ("SSAN"), and date of death (October 19, 2007) for M.B. on M.B.'s Certificate of Death from the Florida Department of Health, Office of Vital Statistics.   Regardless of a difference in birth date, even the "HCFA 1500" forms for M.B. that Lovelace submitted with his *Franks* motion and the instant Motion contain the same HICN/SSAN—the same uniquely identifiable number—as in the claims data and on the Certificate of Death.   In other words, Lovelace's own documents show him billing Medicare using the HICN/SSAN of a deceased person.   Regardless, Lovelace's own documents also show him billing Medicare for services that physicians did not render.   Dr. T.D. and Dr. P.R. did not render any services to any patients—not M.B., not anyone else—at Cornerstone Health Specialists, which were facts before the grand jury and the petit jury.

Even if, *arguendo*, there were any alleged errors before the grand jury, the petit jury's finding of guilt beyond a reasonable doubt renders any such errors harmless.   "The petit jury's subsequent guilty verdict means not only that probable cause existed to believe that the appellant was guilty as charged, but also that he was in fact guilty beyond a reasonable doubt."   United States v. Roggio, 863 F.2d 41, 43 (11th Cir. 1989) (affirming conviction and rejecting claim government acted improperly in obtaining an indictment).   As a result, "any alleged misconduct before the grand jury was harmless."   United States v. Flanders, 752 F.3d 1317, 1333 (11th Cir. 2014) (same); see also United States v. Rosario, 234 F.3d 347, 352 (7th Cir. 2000) (stating "error in the presentation of evidence before the grand jury would be harmless given the jury conviction at trial" which "indicates a proper grand jury proceeding would have still yielded an indictment" and affirming conviction).   For example, even if alleged database mismatches regarding the vital status of a beneficiary resulted in erroneous information about that beneficiary's vital status

being presented to the grand jury, the petit jury had the opportunity to review all the evidence, and the petit jury's verdict of guilty beyond a reasonable doubt cures any such alleged error.

As the Eleventh Circuit held in rejecting arguments similar to Lovelace's, even assuming an agent testified falsely or deceptively before the grand jury—which did not happen here—the fact that the petit jury found Lovelace guilty on all charges demonstrates that he was not prejudiced by the grand jury testimony in question. See Flanders, 752 F.3d at 1333; United States v. Andre, 601 Fed.Appx. 836, 839 (11th Cir. 2015) (affirming conviction) (unpublished).

Regardless, other evidence was presented to the grand jury supporting its probable cause determination irrespective of a beneficiary's vital status.  And all of the evidence of Lovelace's criminal machinations was presented to the petit jury at trial.  The petit jury's swift and sweeping verdict reflects the strength and integrity of the evidence of Lovelace's guilt on all counts.

## CONCLUSION

Lovelace's Motion is meritless for all the reasons stated.  It also is time-barred.  For all of the foregoing reasons, his Motion should be denied without a hearing.

WHEREFORE, the United States respectfully requests that the Court deny Lovelace's Motion without a hearing.

<div style="margin-left:auto">

Respectfully submitted,
A. LEE BENTLEY, III
United States Attorney

By:     _s/Christopher J. Hunter_
        Christopher J. Hunter
        Senior Trial Attorney
        U.S. Department of Justice
        Criminal Division, Fraud Section
        400 North Tampa Street, Suite 3200
        Tampa, Florida 33602
        USA No. 147
        Telephone:202-262-7168
        Email: christopher.hunter@usdoj.gov

</div>

20

## CERTIFICATE OF SERVICE

I hereby certify that on January 17th, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, and that the foregoing document is being served this day on counsel of record via transmission of Notice(s) of Electronic Filing.  I also certify that the exhibits submitted herewith are being filed with the Clerk of Court via hand delivery and served this day on Lovelace's counsel of record via Federal Express.

*s/Christopher J. Hunter*
Christopher J. Hunter